IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-02175-MEH

CHRISTOPHER TUCK,

     Plaintiff,

v.

SHERIFF STEVEN D. NOWLIN, in his individual capacity,
LIEUTENANT JEFFREY COPELAND, in his individual capacity,
DETECTIVE JOHN HAYNES, in his individual capacity, and
MONTEZUMA COUNTY, a municipality,

     Defendants.

---

## MOTION FOR JUDGMENT ON THE PLEADINGS

---

Defendants SHERIFF STEVEN D. NOWLIN, LIEUTENANT JEFFREY COPELAND, DETECTIVE JOHN HAYNES, and MONTEZUMA COUNTY submit this Fed. R. Civ. P. 12(c) Motion for Judgment on the Pleadings.

### CERTIFICATION OF CONFERRAL

Undersigned counsel certifies that he has conferred with counsel for Plaintiff regarding the relief requested herein and is authorized to state that Plaintiff opposes the same.

### INTRODUCTION

This case arises out of an incident in which a law enforcement drone flight was undertaken over portions of the property located at 26956 Road R, Dolores, Colorado ("Road R Property"), where Plaintiff was residing, based on suspicion of illegal marijuana cultivation. Plaintiff alleges, in part, that the drone flight violated search and seizure provisions of the United States and Colorado Constitutions. Presented here is the issue of the constitutional parameters for the use of

drone flights by law enforcement to investigate suspected illegal cultivation of marijuana on private property.

## CLAIMS FOR RELIEF AGAINST DEFENDANTS

On August 24, 2022, Plaintiff filed a Complaint against Sheriff Steve D. Nowlin ("Nowlin" or "Sheriff Nowlin"), Lieutenant Jeffrey Copeland ("Copeland" or "Lt. Copeland"), Detective John Haynes ("Haynes" or "Detective Haynes"), each in their individual capacities, and Montezuma County (the "County") (Doc. 1). On February 2, 2023, Plaintiff Christopher Tuck filed his First Amended Complaint (Doc. 29) ("1AC"). Therein, Plaintiff asserts the following claims:

| Claim | Description | Against |
|-------|-------------|---------|
| First | C.R.S. § 13-21-131, Colo. Const. Art. II, Section 7 – Unlawful Entry and Search | Defendants Copeland, Haynes, and Nowlin |
| Second | C.R.S. § 13-21-131, Colo. Const. Art. II, Section 7 – Invalid Search Warrants/Unlawful Search | Defendant Copeland |
| Third | 42 U.S.C. § 1983, Fourth Amendment Violation – Invalid Search Warrants/Unlawful Search | Defendant Copeland |
| Fourth | 42 U.S.C. § 1983, Fourth Amendment Violation – Unconstitutional Customs, Policies, and/or Practices | Defendant Montezuma County |
| Fifth | 42 U.S.C. § 1983, Fourth Amendment – Malicious Prosecution | All Defendants |

## ALLEGATIONS IN THE FIRST AMENDED COMPLAINT

During the week of August 15, 2020, an informant, who wished to remain anonymous, advised Lt. Copeland that he believed "large amounts of marijuana were being unlawfully cultivated" from two possible properties. (1AC at ¶ 25.) The informant stated that when the wind blew from the direction of these properties, it smelled of marijuana. *Id.* at ¶ 28. The informant pointed out the location of the two properties to Copeland. *Id.*

Lt. Copeland observed the two properties from the public roadway. *Id.* at ¶ 29. On the first property (not the Road R Property), Copeland observed a greenhouse which contained six marijuana plants sticking out of the top. *Id.* at ¶ 30. Plaintiff alleges that Copeland did not see marijuana plants on the Road R Property from the public roadways. *Id.* at ¶ 31.

On August 24, 2020, Plaintiff alleges that Lt. Copeland, along with Detective Haynes, conducted a drone flight over the Road R Property using a Montezuma County Sheriff's Office ("MCSO") drone. *Id.* at ¶ 35. Haynes piloted the flight and launched the drone on the informant's property with the informant's consent. *Id.* at ¶¶ 40–41. Copeland and Haynes are alleged to have pre-scheduled the drone to follow a flight path surrounding the Road R Property from around 390 feet above the ground. *Id.* at ¶ 42. The drone took at least twenty (20) aerial photographs, *id.* at ¶ 47, and the flight lasted approximately seven minutes. *Id.* at ¶ 52.

In paragraph 44 of his 1AC, Plaintiff included the following satellite image superimposing the flight path of the drone and delineating the property lines of the Road R Property:



Plaintiff alleged that a majority of the twenty photographs taken by the drone were taken while over the Road R Property – conceding by implication that some of the twenty photographs were taken while not over the Road R Property. Additionally, the satellite image of the drone flight demonstrates that the drone's flight path never flew directly over the Road R residence.

Detective Haynes is alleged to have provided Lt. Copeland with the photographs taken by the drone, which Copeland reviewed on a computer. *Id.* at ¶ 53. Viewing the photographs on the computer, Plaintiff alleges that Copeland "saw what appeared to be marijuana plants growing" in two gardens on the Road R Property. *Id.* at ¶ 54. Using these photos, between August 27, 2020, and October 6, 2020, Copeland submitted four search warrant affidavits for the Road R Property, all of which were authorized by Judge JenniLynn Everett Lawrence. *Id.* at ¶ 61. Plaintiff alleges that "of the four search warrants, the first three contained material misrepresentations." *Id.* Plaintiff concedes, however, that of these three warrants, only one was served. *Id.* at ¶¶ 80, 110.

As to the first search warrant (search warrant 20-58), Plaintiff alleges that Lt. Copeland "intentionally misrepresented that the drone flew *outside* the *home's curtilage and property* to take still photos of the property." *Id.* at ¶ 67. Relying on the zoomed-in drone photographs, Plaintiff alleges that Copeland observed illegal cultivation of around 210 marijuana plants. *Id.* at ¶ 69. Copeland did not execute search warrant 20-58 on the Road R Property. *Id.* at ¶ 80.

Regarding the second search warrant (search warrant 20-59), Plaintiff alleges that Lt. Copeland lacked probable cause because he failed to describe his "personal knowledge of the facts" upon which the informant based his claims and because "[n]owhere in the affidavit did . . . Copeland state that he smelled marijuana coming from Mr. Tuck's property or that he observed what he believed to be marijuana plants . . . ." *Id.* at ¶¶ 83, 85. Plaintiff further alleges that Copeland "failed to attach any [drone] photos" to the affidavit. *Id.* at ¶ 88.

On September 2, 2020, Defendants are alleged to have executed search warrant 20-59 on the Road R Property. *Id.* at ¶ 94. During the search, Lt. Copeland, Sheriff Nowlin, and other MCSO officers "took photos of [the Road R] property, seized samples of his plants, and destroyed his remaining marijuana plants." *Id.* at ¶ 95. Plaintiff "was issued a summons for the unlawful cultivation of more than thirty marijuana plants, a class three drug felony in violation of C.R.S. 18-18-406." *Id.* at ¶ 99.

Plaintiff also alleges that Judge Lawrence authorized the third search warrant (search warrant 20-60) and the search and seizure of computers and all phones. *Id.* at ¶¶ 104–05. Plaintiff concedes that Copeland did not execute this third search warrant. *Id.* at ¶ 110.

Plaintiff additionally alleges that Montezuma County has "policies, customs, or practices in conducting . . . warrantless drone searches" and that the County "failed to properly train, supervise, and/or discipline its employees regarding lawful searches . . . over private residences." *Id.* at ¶¶ 192, 203.

Plaintiff expressly refers in the 1AC to the photographs that were taken by the drone, as well as to the testimony at the hearing on the motion to suppress evidence obtained from the drone flight in Plaintiff's criminal case. *Id.* at ¶¶ 2, 45–48, 70, 113–16, 160. Attached as **EXHIBIT A** is that portion of the transcript of the motion to suppress hearing which addresses the drone photographs. The transcript sets out which of the drone photographs were taken over the Road R Property and which were taken over property other than the Road R Property. Ex. A, 123:12–17, 125:4–9. Attached as **EXHIBIT B-1** are those photographs identified in the transcript as taken over the Road R Property. Attached as **EXHIBIT B-2** are those photographs identified in the transcript as taken over property other than the Road R Property. While, generally, a court considers only the contents of the complaint when ruling on a Rule 12(b)(6) motion, documents

incorporated by reference in the complaint and documents referred to in and central to the complaint may be considered without converting the motion to one for summary judgment. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). *See also GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384–85 (10th Cir. 1997). As such, the transcript and drone photographs may be considered in this motion.

## ARGUMENT

### I.     STANDARD OF REVIEW

A motion for judgment on the pleadings made pursuant to Fed. R. Civ. P. 12(c) is reviewed under the same standard as a motion for failure to state a claim made pursuant to Fed. R. Civ. P. 12(b)(6). *See Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 528 (10th Cir. 1992).

In considering a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the Supreme Court requires that a complaint contain enough allegations of fact, taken as true, "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "[M]ere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190–91 (10th Cir. 2012) (quoting *Twombly,* 550 U.S. at 555). In applying this standard, the Tenth Circuit has held that where allegations in a complaint "are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly,* 550 U.S. at 570). Further, the Tenth Circuit has held that "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kansas Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1215 (10th Cir. 2011). Further, it is "not . . . proper to assume that [the plaintiff] can prove facts that it has not alleged or that the defendants have

violated . . . laws in ways that have not been alleged." *Twombly,* 550 U.S. at 563 n.8 (quoting

*Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 526 (1983)).

## II.   DEFENDANTS COPELAND, HAYNES, AND NOWLIN ARE ENTITLED TO DISMISSAL OF PLAINTIFF'S FEDERAL CLAIMS FOR RELIEF (THIRD AND FIFTH CLAIMS)

### A.   Applicable Law

#### 1.   Qualified Immunity

To avoid application of qualified immunity, a plaintiff must: (1) allege facts that make out

a violation of a constitutional right; and (2) show that the constitutional right was clearly

established at the time it was allegedly violated. *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

If there has been no constitutional violation, then an officer is entitled to qualified immunity.

*Saucier v. Katz*, 533 U.S. 194, 201 (2001). A reviewing court has discretion to address either prong

first. *Pearson*, 555 U.S. at 236.

In practical terms, courts should extend qualified immunity unless there is precedent which

"squarely governs" the case or otherwise places the constitutional question "beyond debate" such

that "only someone plainly incompetent or who knowingly violate[s] the law" would have

proceeded as the defendant did. *Mullenix v. Luna,* 577 U.S. 7, 15 (2015) (internal quotation marks

omitted). As such, an officer will be entitled to qualified immunity unless "every 'reasonable

official would have understood that what he [was] doing'" violated the Constitution. *Ashcroft v.

al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

Clearly established law should not be defined at a high level of generality. *White v. Paul*y,

580 U.S. 73, 79 (2017). The Supreme Court has indicated that in context of qualified immunity for

alleged Fourth Amendment violations in particular, such specificity is necessary where "it is

sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12.

        2.    <u>Fourth Amendment Law and Drones</u>

All of Plaintiff's claims are premised on his allegation that the drone flight was an unconstitutional warrantless search. In *Katz v. United States*, 389 U.S. 347, 360 (1967), the Supreme Court determined that whether a warrantless search is considered reasonable under the Fourth Amendment depends on whether a person has a "constitutionally protected reasonable expectation of privacy." Whether an individual has a constitutionally protected reasonable expectation of privacy is a two-part test: "(1) whether the individual has manifested a subjective expectation of privacy in the object or place to be searched and (2) whether that expectation is one society is prepared to recognize as reasonable." *Reeves v. Churchich*, 484 F.3d 1244, 1254 (10th Cir. 2007).

It is undisputed that an individual has a reasonable expectation of privacy in the interior of their home. *Kyllo v. United States*, 533 U.S. 27, 34 (2001). However, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351.

As to open fields, "[t]here is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields" and, as such, "an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers." *Oliver v. United States*, 466 U.S. 170, 179, 181 (1984). The Supreme Court further articulated in *United States v. Dunn*, 480 U.S. 294, 304 (1987), that "there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields."

Although it has yet to address privacy concerns implicated by the use of drones, the Supreme Court has held that an expectation of privacy against aerial observation, even as to curtilage, from publicly navigable airspace is not one that society is prepared to recognize as reasonable. In *California v. Ciraolo*, 476 U.S. 207, 209 (1986), police officers flew a private airplane over an individual's yard to observe illegal cultivation of marijuana plants. The Supreme Court determined that the individual's expectation of privacy in the area immediately surrounding his home was unreasonable since "[a]ny member of the public flying in this airspace who glanced down could have seen everything that these officers observed." *Ciraolo*, 476 U.S. at 213–14. "The Fourth Amendment simply does not require the police traveling in the public airways . . . to obtain a warrant in order to observe what is visible to the naked eye." *Id.* at 215.

Likewise, in *Florida v. Riley*, 488 U.S. 445, 447–48 (1989), the Supreme Court considered whether a helicopter flight at an altitude of 400 feet over an individual's greenhouse to observe marijuana plants was reasonable under the Fourth Amendment. *Riley* held that, despite the fact that Federal Aviation Administration ("FAA") regulations require fixed-wing-aircraft to be operated at a minimum altitude of 500 feet, *Riley*, 488 U.S. at 451 n.3, since "helicopters are not bound by the lower limits of the navigable airspace" required for other aircraft under the FAA, the helicopter there was not violating the law. *Id.* at 451. "Any member of the public could legally have been flying over Riley's property in a helicopter at the altitude of 400 feet and could have observed Riley's greenhouse." *Id.* As such, the Court concluded, the surveillance was not a search for which a warrant was required. *Id.*

In assessing whether an individual's expectation of privacy is one that society is prepared to recognize as reasonable, the Colorado Supreme Court has considered the degree of intrusiveness of the search, including "public exposure of the area as well as the duration, continuity, and nature

of the surveillance." *People v. Tafoya*, 494 P.3d 613, 622 (Colo. 2021). In *Tafoya*, law enforcement installed a pole camera that continuously recorded footage of a defendant's property for a period of three months, showing the defendant's everyday habits and routines. *Id.* at 622–23. The court held that "this surveillance involved a degree of intrusion that a reasonable person would not have anticipated" and thus qualified as an unreasonable search in violation of the Fourth Amendment. *Id.* at 623 (internal quotation marks omitted).

In *Henderson v. People*, 879 P.2d 383, 390 (Colo. 1994), law enforcement's observation of marijuana plants in a defendant's yard from a helicopter was not considered a search due to the "very limited degree of intrusiveness" of the helicopter that made approximately five passes over the defendant's yard over the course of five minutes. Conversely, in *People v. Pollock*, 796 P.2d 63, 63 (Colo. App. 1990), the Colorado Court of Appeals found that an aerial surveillance went beyond mere observation and thus constituted a Fourth Amendment search, when "the helicopter descended to 200 feet, and hovered in the area for several minutes, creating enough noise that numerous people ran out of their homes to see what was going on." *Cf. Riley,* 488 U.S. at 452 (a helicopter surveillance was nonintrusive upon a finding that the helicopter did not interfere with the respondent's normal use of his house or greenhouse, and because there was no evidence of "undue noise, wind, dust, or threat of injury").

The federal government has regulated drone ("unmanned aircraft") use under its exclusive sovereignty of airspace. 49 U.S.C. § 40103(1)(a) ("The United States Government has exclusive sovereignty of airspace of the United States."). Based on that authority, Congress established requirements for the private use of drones, requiring in part that: the drone "is flown within the visual line of sight of the person operating the aircraft or a visual observer co-located and in direct communication with the operator;" the drone "is operated in a manner that does not interfere with

and gives way to any manned aircraft;" the drone "is flown from the surface to not more than 400 feet above ground level;" and "the operator has passed an aeronautical knowledge and safety test." 49 U.S.C. § 44809(a). And, in the FAA Modernization and Reform Act of 2012, Congress tasked the Secretary of Transportation with developing "a comprehensive plan to safely accelerate the integration of civil unmanned aircraft systems into the national airspace system." 49 U.S.C. § 44802(a)(1).

While setting a maximum altitude, neither Congress nor the Department of Transportation has set a minimum altitude for drone flights. While there has been debate over whether and at what altitude such minimum altitude be set, federal law did at relevant times here and does permit drone flights from the ground up to 400 feet (and federal law preempts contrary state or local regulation).

Although a takings case, some guidance on the issue of reasonable expectations of privacy in airspace may be gleaned from *United States v. Causby*, 328 U.S. 256 (1946). In *Causby*, the Supreme Court addressed the viability of the common law doctrine of *cujus est solum, ejus est usque ad coelum et ad inferos* (he who owns the soil owns upwards to the heavens and down to the depths) in the context of a private landowner's claim that their property rights were violated by frequent and extremely low flyovers of military aircraft (83 feet above the property, which was "67 feet above the house, 63 feet above the barn and 18 feet above the highest tree") accessing a local military leased airport. *Causby*, 328 U.S. at 258. While recognizing that Congress had, under the Commerce Clause, assigned control of the national airspace to the federal government and that the *ad coelum* doctrine "has no place in the modern world," the Court held that private landowners retained their constitutionally protected property interests in the airspace in "the immediate reaches of the enveloping atmosphere" above their land and "own[] at least as much of the space above the ground as [they] can occupy or use in connection with the land." *Id.* at 261, 264. The Court

11

explained that "[t]he superadjacent airspace at this low altitude is so close to the land that continuous invasions of it affect the use of the surface of the land itself." *Id.* at 265. The Court also observed:

> The airplane is part of the modern environment of life, and the inconveniences which it causes are normally not compensable under the Fifth Amendment. The airspace, apart from the immediate reaches above the land, is part of the public domain. We need not determine at this time what those precise limits are. Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land.

*Id.* at 266.

### B.    **Application**

1.    First Qualified Immunity Prong: The Drone Flight Did Not Violate Federal Constitutional Fourth Amendment Search and Seizure Provisions

Based on the aforementioned case law discussing reasonable expectations of privacy with respect to aerial observation, the drone flight over the Road R Property here does not constitute a search for which a warrant was required because Plaintiff's expectation of privacy was not one that society is prepared to recognize as reasonable. Any member of the public flying in the airspace above Plaintiff's yard could have glanced down and seen the marijuana gardens captured by the drone's camera. Additionally, the degree of intrusiveness of the drone flight was minimal. The drone flight lasted approximately seven minutes (with a significant portion not over the Road R Property) and made only one circular flight passing around the Road R Property and never directly over the Road R Property residence. (1AC at ¶ 52.) Significantly, Plaintiff does not allege that he was disturbed by the flight or, indeed, even knew it occurred.

Like the helicopter in *Riley*, which flew at an altitude of 400 feet, the drone here flew at an altitude only ten feet lower – approximately 390 feet. *Id.* at ¶ 42. Moreover, the drone followed a flight path pre-planned by Defendants, *id.*, to intentionally fly at such high altitude and not directly

over the Road R Property residence.

Of course, any observation of the Road R Property that was not curtilage is easily found to be constitutionally permissible on the basis of the open fields doctrine. *See Oliver*, 466 U.S. at 180. Here, Plaintiff's argument incorrectly presumes that the Road R Property's backyard was part of the property's curtilage. (*See* 1AC at ¶¶ 67, 86.) Curtilage has been defined as "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Oliver*, 466 U.S. at 180 (internal quotation marks omitted). In *Reeves*, the Tenth Circuit concluded that the front yard of a duplex was not curtilage and was, therefore, an open field where the yard was in close proximity to the home, but no evidence existed that the yard was used for intimate activities of the home. *Reeves*, 484 F.3d at 1254–55. Similarly, here, Plaintiff has offered in his 1AC no plausible allegations to suggest that the area of the observed marijuana grow was used for intimate activities of the home.

To the extent Plaintiff argues that he possessed a reasonable expectation of privacy around the property because the yard was "fully enclosed with a fence on almost all parts," *id.* at ¶ 16, the Supreme Court has consistently rejected the argument that "the erection of fences on an open field . . . creates a constitutionally protected privacy interest." *United States v. Dunn*, 480 U.S. 294, 304 (1987) ("[a]n open field need be neither 'open' nor a 'field'"); *see also Oliver*, 466 U.S. at 171. In *Ciraolo*, for example, although the respondent had completely enclosed his yard with a six-foot outer fence and a ten-foot inner fence, the Supreme Court determined that he did not have a reasonable expectation of privacy in his backyard because "the mere fact that an individual has taken measures to restrict some views of his activities [does not] preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *Ciraolo*, 476 U.S. at 213.

Moreover, the fence surrounding the Road R Property is not alleged to have limited the view of the property as opposed to designating the property boundaries. Still, even if Plaintiff could establish that he took affirmative steps to exhibit an expectation of privacy from ground-level surveillance, the existence of a fence does not effectively bar the public from lawfully viewing open fields from the air. *See State v. Davis*, 360 P.3d 1161, 1167 (N.M. 2015) ("exhibiting a reasonable expectation of privacy from ground level surveillance may not always be enough to protect from public or official observation from the air under the Fourth Amendment").

Even if Plaintiff has plausibly alleged that the marijuana gardens were within the Road R Property curtilage, the drone aerial surveillance, under the aerial surveillance precedent of the United States Supreme Court, establishes that it met constitutional scrutiny. Indeed, Plaintiff does not allege the drone flight failed to meet FAA regulations. And, in fact, such regulation requires drone flights to be below 400 feet and does not set a minimum altitude for such flights. *See* 14 C.F.R. § 107.51. The subject drone flight was, as alleged, purposefully kept at the upper limit (390 feet) of FAA regulations. And, Plaintiff cannot credibly distinguish the subject drone flight at 390 feet altitude from the helicopter flight in *Riley*, which was only ten feet higher and by a much more intrusive aircraft.

Plaintiff also alleges that "[w]ithout zooming into the photos captured by the drone, Defendants Copeland and Haynes could not observe or discern what appeared to be marijuana plants on [the Road R] property." (1AC at ¶ 58.) However, the use of technology that allows photo enhancement does not materially impact the constitutional considerations as such zoom technology is readily available to the public. (Zoom technology is available on almost every modern smartphone and camera.) *Compare Dow Chemical Co. v. United States*, 476 U.S. 227, 238 (1986) (aerial mapping camera to photograph Dow's facility at altitudes of 1,200 ft. to 12,000 ft., that

14

allowed for extreme image magnification was not unreasonable, because "[a]lthough they undoubtedly give EPA more detailed information than naked-eye views . . . [t]he mere fact that human vision is enhanced somewhat, at least to the degree here, does not give rise to constitutional problems"), *with  Kyllo v. United States*, 533 U.S. 27, 34–45 (2001) (holding that where officers used a thermal scanner to detect for marijuana grow, the "sense-enhancing technology" was a search, at least where "the technology in question [was] not in general public use").

Finally, as established at the suppression hearing, photographs taken during the drone flight over property other than the Road R Property depicted the same marijuana grow as did the photographs taken over the Road R Property. (*Compare* Exhibit B-1 *with* Exhibit B-2.) As such, even excluding the photographs taken over the Road R Property, which is the test for determining whether an affidavit for an arrest warrant is supported by probable cause, after exclusion of reference to purportedly improper evidence[1] there was ample remaining photographic evidence that supported probable cause for the warrant.

In conclusion, the drone flight over the Road R Property: flew in airspace in which any member of the public could have legally flown a drone and viewed by video or photograph the marijuana plants; did not fly directly over the residence; did not disturb Plaintiff's quiet enjoyment of the Road R Property; and did not use sense-enhancing technology or technology that was not available to the general public. And, Plaintiff concedes that the drone was flown within ten feet of the maximum altitude in which the federal government has determined that drones can be operated. Additionally, the photographs taken that depict the marijuana gardens from locations other than over the Road R Property support probable cause.

---

[1]        *See Franks v. Delaware*, 438 U.S. 154, 171–72 (1978); *see also Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004).

This is not a case where Plaintiff alleges that the drone was flown in the superadjacent airspace – a fact scenario that must await another case and another day. Here, Plaintiff did not have a reasonable expectation of privacy regarding drone flights over the Road R Property that would be recognized under the Fourth Amendment, and thereby, the flight was not an unreasonable search.

2.      Second Qualified Immunity Prong: There Is No Clearly Established Law That the Drone Flight Violated Plaintiff's Fourth Amendment Rights

Even if there were a question as to whether Defendants' conduct in flying a drone over the Road R Property was constitutionally permissible, Defendants find no existing precedent – and indeed, as indicated by the law referenced above, the law establishes otherwise – to make it sufficiently clear that every reasonable officer would have understood that what he was doing violated Plaintiff's constitutional rights. As set out in the 1AC, Defendants reviewed the Montezuma County Sheriff's Office Unmanned Aerial System Operations Policy prior to the drone flight and conducted the flight in accordance with that policy and FAA regulations.

Defendants find no case with sufficient factual symmetry to put them on notice that a drone flight over the Road R Property's yard would trigger a Fourth Amendment unlawful entry and search claim. Rather, existing precedent, including that of the United States Supreme Court, supports Defendants' beliefs that the drone flight was, in fact, constitutionally permissible. As such, Defendants Copeland, Haynes, and Nowlin should be entitled to qualified immunity on Plaintiff's Fourth Amendment Claims for Relief.

3.      Good Faith Defense Separate and Apart from Qualified Immunity

Professor Sheldon Nahmod observed in Civil Rights and Civil Liberties Litigation: The Law of Section 1983 § 8:57 (2022–2023 ed.), that 15 years prior to the Supreme Court's

16

establishing in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982) the "qualified immunity" defense to 42

U.S.C. § 1983 claims, the Court recognized in *Pierson v. Ray*, 386 U.S. 547, 551–52 (1967) the

longstanding common law affirmative defense available to law enforcement officers "of good faith

and probable cause to an action under § 1983 for unconstitutional arrest." *Pierson* involved a sit-

in demonstration in which the plaintiff was arrested under a breach of peace statute later

determined to be unconstitutional. *Pierson,* 386 U.S. at 549–50. Following a discussion of the

common law underpinnings of the good faith defense available to law enforcement officers, the

Court wrote:

> Under the prevailing view in this country a peace officer who arrests someone with
> probable cause is not liable for false arrest simply because the innocence of the
> suspect is later proved. A policeman's lot is not so unhappy that he must choose
> between being charged with dereliction of duty if he does not arrest when he has
> probable cause, and being mulcted in damages if he does. Although the matter is
> not entirely free from doubt, *the same consideration would seem to require
> excusing him from liability for acting under a statute that he reasonably believed
> to be valid but that was later held unconstitutional* on its face or as applied.

*Id.* at 555 (emphasis added) (citation omitted). The Tenth Circuit has long recognized such good

faith defense to law enforcement officers acting on reliance of an existing statutory law. *See, e.g.,*

*Miller v. Stinnett*, 257 F.2d 910, 915 (10th Cir. 1958).

American Law Reports Federal annotated cases addressing a § 1983 law enforcement good

faith defense in a now superseded collection of cases. David J. Oliveiri, Annotation, *Defense of*

*good faith in action for damages against law enforcement official under 42 U.S.C.A. § 1983,*

*providing for liability of person who, under color of law, subjects another to deprivation of rights*,

61 A.L.R. Fed. 7 (Originally published in 1983). Oliveiri's report noted that in *Monroe v. Pa[p]e*,

365 U.S. 167 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658

(1978), the Supreme Court recognized a § 1983 claim against state and local law enforcement for

unconstitutional search and seizure, wrongful arrest, and wrongful imprisonment. *Id.* at § 2[a]. The report went on to note that *Pierson* was in reaction to *Pape*:

> One effort to establish parameters to this cause of action was the Supreme Court's holding in *Pierson v. Ray* [ ], which formally extended a defense of good faith and probable cause to police officers in an action for damages under 42 U.S.C.A. § 1983. To some extent before, but especially after this holding of the Supreme Court in *Pierson*, there has been a general acceptance of the proposition that a defense of good faith may be available to law enforcement officials from whom damages are sought under 42 U.S.C.A. § 1983.

*Id.* Here, separate and apart from the qualified immunity afforded under *Harlow*, the individual Defendants are entitled to good faith immunity[2] in part, but not limited to, on their reliance on federal statutory and regulatory law permitting drone flights below an altitude of 400 feet and without a minimum. And, as noted, federal regulation of U.S. airspace preempts any contrary state law or regulation.

### III.   DEFENDANTS COPELAND, HAYNES, AND NOWLIN ARE ENTITLED TO DISMISSAL OF PLAINTIFF'S STATE CLAIMS FOR RELIEF (FIRST AND SECOND CLAIMS)

#### A.   The Drone Flight Did Not Violate Colorado Constitutional Search and Seizure Provisions

Article II, Section 7 of the Colorado Constitution protects against unreasonable searches and seizures. The protections of Article II, Section 7 are "almost identical" to Fourth Amendment protections, *People v. Rister*, 803 P.2d 483, 489 (Colo. 1990), and "like its federal counterpart, are limited by reasonable expectations of privacy – that is, expectations which the law is prepared to recognize as legitimate." *People v. Velasquez*, 641 P.2d 943, 948 (Colo. 1982).

Although Colorado courts have occasionally read the Colorado Constitution as providing

---

[2]   Defendants pled good faith immunity in their Answer to the 1AC. (Doc. 32, p. 29, Defenses ¶¶ 3–5.)

a broader definition of what constitutes a legitimate expectation of privacy than the Fourth Amendment,[3] its approach in determining what kinds of searches and seizures are reasonable under Article II, Section 7 is similar to the approach taken by the United States Supreme Court. *Rister*, 803 P.2d at 489 (rejecting the argument that the reasonableness standard of Article II, Section 7 should be construed differently from the Fourth Amendment's reasonableness requirement). The Colorado Supreme Court has even considered the state and federal constitutional provisions protecting against unreasonable searches and seizures to be coextensive. *People v. Stock*, 397 P.3d 386, 390 (Colo. 2017); *see also People v. Allen*, 450 P.3d 724, 728–29 (Colo. 2019) (applying both state and federal provisions, without distinguishing them, when assessing the constitutionality of a vehicle seizure).

In *People v. Bartley*, 791 P.2d 1222, 1223 (Colo. App. 1990), for example, law enforcement's aircraft flight over a defendant's yard to look for evidence of theft was not "an impermissible intrusion on the defendant's right of privacy," where, even though the evidence photographed during the flight was determined to be part of the defendant's curtilage, there was no evidence "that the flight path or altitude of the airplane violated any applicable law or regulation or that the information obtained was not visible to the naked eye." Thus, the flight did not constitute a search under Article II, Section 7. *Id.*

---

[3]      A broader definition of what constitutes a legitimate expectation of privacy under the Colorado Constitution, as held by previous Colorado courts, is not applicable to the case at hand. For example, in *People v. Oates*, 698 P.2d 811, 815–16 (Colo. 1985), the court concluded that greater privacy protections "encompass[] the expectation that *purchased commercial goods* will be free from government surveillance such as beepers." (emphasis added). *See, e.g., People v. Corr*, 682 P.2d 20, 25 (Colo. 1984) (evidence obtained from a telephone toll call record is a search under the Colorado Constitution); *Charnes v. DiGiacomo*, 200 Colo. 94, 99–100 (Colo. 1980) (taxpayer had a reasonable expectation of privacy in the bank records of his financial transactions under the Colorado Constitution).

As set out in Section II.B.1., the drone flight here did not violate federal Fourth Amendment search and seizure provisions because the search was not unreasonable. As Colorado courts interpret its constitutional search and seizure provisions similar to those provided by the federal constitution, for the same reasons as argued above, the drone flight did not violate Colorado constitutional search and seizure provisions.

**B.      Good Faith Defense**

As set out in Section II.B.3., separate and apart from qualified immunity, good faith provides law enforcement officers a common law defense of good faith. Colorado has long afforded this defense to law enforcement officers. *See Cooper v. Hollis*, 600 P.2d 109, 111 (Colo. App. 1979) (police impoundment of a car was a ministerial act that police officers could be personally liable for wrongful impoundment subject to the defense of good faith and reasonableness). Here, Plaintiff alleges only conclusory allegations that the individual Defendants acted in any way other than in good faith. As such, the claims brought under the state constitution fail to state a plausible claim and should be dismissed.

**C.      The Provisions of C.R.S. § 13-21-131(2)(b) That "Qualified Immunity Is Not a Defense to Liability" for Colorado Constitutional Claims Against Law Enforcement Officers Is Unconstitutionally Vague**

C.R.S. § 13-21-131(2)(b) purports to prevent the use of "qualified immunity" as a defense to claims against law enforcement officers based on alleged Colorado constitutional violations. Qualified immunity is not defined within the statute. As such, this provision is unconstitutionally vague.

*Bd. of Educ. of Jefferson Cty. Sch. Dist. R-1 v. Wilder*, 960 P.2d 695, 715 (Colo. 1998), determined that "[a] statute offends due process of law . . . if it is so vague that it does not provide fair warning of the conduct prohibited or if its standards are so ill-defined as to create a danger of

arbitrary and capricious enforcement." (quoting *Parrish v. Lamm*, 758 P.2d 1356, 1367–68 (Colo. 1988)). Vague statutory text leaves people "in the dark about what the law demands," thereby allowing "courts to make . . . up" what the statute is intended to provide. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1224 (2018) (Gorsuch, J., concurring). It is unclear what defenses the statute is intended to prohibit.

"Qualified immunity" has many potential meanings, although Colorado courts have used the term to distinguish it from "absolute immunity." For instance, in *Higgs v. Dist. Ct. In & For Douglas Cty.*, 713 P.2d 840, 857 (Colo. 1985), the term qualified immunity was used to distinguish between absolute immunity provided to prosecutors for activities performed under their prosecutorial function from those classified as an investigative function – the latter providing for only qualified immunity. Similarly, "[j]udges are entitled to absolute immunity for their judicial or adjudicative acts. However, when a judge acts in an administrative rather than judicial capacity, such as when the judge disciplines or discharges a staff member, the judge is entitled only to qualified immunity." Cathy Havener Greer, *Governmental Employee Immunity in Actions Brought Pursuant to 42 U.S.C. § 1983*, 38 COLO. LAW. 29, 29, (2009). Additionally, although nothing like *Harlow* qualified immunity, good faith immunity might be characterized as a type of qualified immunity. *See Atkins v. Lanning*, 556 F.2d 485, 487 (10th Cir. 1977) (where arrest "warrant was regular on its face and there [was] no claim that [the] arrest was effected in other than a proper manner. . . . the arresting officer [was] entitled to the qualified immunity defense of a good faith belief that his behavior was proper" and, hence, was not liable under Civil Rights Act when it was discovered that plaintiff who was arrested was, in fact, the wrong person).

The statute does not define what types of "qualified immunity" it intends to limit of the many types of "qualified immunity" articulated under Colorado law. It additionally does not

purport to refer to that body of law that has grown around defenses to federal claims under 42 U.S.C. § 1983, and if so, if it intends to not only eliminate the prong two "clearly established law" component of federal qualified immunity but, also, the prong one "constitutional violation" component. As written, then, that portion of the statute barring law enforcement defendants a "qualified immunity" defense should be held unconstitutionally vague. And, for the reasons stated above, the individual defendants should be granted judgment on the pleadings as to the Colorado Constitutional claims as they did not violate clearly established law.

## IV.    PLAINTIFF'S CLAMS BASED ON PROCUREMENT OF AN UNEXECUTED WARRANT SHOULD BE DISMISSED

To the extent any of Plaintiff's claims are based on the procurement of search warrants that were not served, such warrants cannot be reasonably said to have caused Plaintiff to have suffered a constitutional violation, either state or federally based, and should be dismissed.

## V.     PLAINTIFF'S CLAIM FOR RELIEF FOR MALICIOUS PROSECUTION SHOULD BE DISMISSED (FIFTH CLAIM)

Plaintiff premises his claim for malicious prosecution on the allegation that Defendants "participated in the institution of . . . [and] continued prosecution of Plaintiff with knowledge that the grounds for obtaining the search warrant and conducting the subsequent search were based on their illegal drone search." (1AC at ¶ 206.) This claim fails to state a plausible claim against Defendants.

To establish a Fourth Amendment claim for malicious prosecution, a plaintiff must prove that "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Lopez v. Prince*, No. 11-cv-02352-CMA-BNB, 2012 WL 3277178, at *5 (D.

Colo. Aug. 9, 2012). Additionally, to maintain the requisite causation link, a malicious prosecution claim requires that the defendant officer misrepresented or concealed material facts from the prosecutor. As noted by Magistrate Judge Kristen L. Mix in *Schudel v. Miller*, No. 12-CV-01864-REB-KLM, 2013 WL 12318277, at *7 (D. Colo. Nov. 8, 2013):

> Generally, plaintiffs cannot sue police officers for malicious prosecution under Section 1983 because "'the chain of causation is broken' between the arrest and the actual prosecution." *Barton v. City & Cnty. of Denver*, 432 F. Supp. 2d 1178, 1207 (D. Colo. 2006) (quoting *Taylor [v. Meacham*, 82 F.3d 1556][,] 1564 [(10th Cir. 1996)]. In her concurrence in *Albright v. Oliver*, 510 U.S. 266, 279 n.5 (1994) (Ginsburg, J., concurring), Justice Ginsburg reasoned that the principal player in carrying out a prosecution is not the police officer but, rather, the prosecutor. Thus, "the anomaly lies in the reality that, under a malicious prosecution claim against an officer, 'the star player is exonerated, but the supporting actor is not.'" *Lopez [v. Prince*, No. 11-cv-02352-CMA-BNB], 2012 WL 3277178, at *5 [(D. Colo. Aug 9, 2012)] (quoting *Albright*, 510 U.S. at 279 n.5 (Ginsburg, J., concurring)). *See also Washington v. Summerville*, 127 F.3d 552, 559–60 (7th Cir. 1997). Nonetheless, malicious prosecution claims may be proper if the police officer misrepresents or conceals facts from the prosecutor. *Barton*, 432 F. Supp. 2d at 1207.

Here, Plaintiff does not allege, nor could he, that any of the Defendants misrepresented or concealed facts from the prosecutor regarding the use of the drone for purposes of investigation of Plaintiff's illegal marijuana grow operation and, indeed, the use of the drone for those purposes was included on the face of the warrant. Additionally, Plaintiff does not plausibly allege Defendant Nowlin's or Defendant Haynes' participation in the prosecution of Plaintiff. And, finally, Plaintiff fails to plausibly allege that any of the Defendants acted with malice, knowing that the use of the drone was unconstitutional. Indeed, as set forth herein, Defendants continue to maintain the constitutionality of the drone flight here.

## VI. PLAINTIFF'S CLAIM FOR RELIEF AGAINST MONTEZUMA COUNTY SHOULD BE DISMISSED (FOURTH)

### A. Montezuma County Is Not a Proper Party

Pursuant to C.R.S. § 30-11-105, all suits brought against a county must be brought in the name of its board of county commissioners. C.R.S. § 30-11-105 provides the exclusive method by which jurisdiction over a county can be obtained. *Calahan v. Cty. of Jefferson*, 429 P.2d 301, 302 (Colo. 1967). "An action attempted to be brought under any other designation is a nullity, and no valid judgment can enter in such a case." *Id.* (citing *John Deere Plow Co. v. Cty. of Phillips*, 48 P.2d 793 (Colo. 1935)). Because Montezuma County is not a properly named defendant, it should be dismissed from this action.

### B.   Plaintiff Has Failed to Establish an Underlying Constitutional Violation

A plaintiff seeking to hold a municipal entity liable pursuant to Section 1983 must demonstrate that some policy, procedure, or custom of the municipality was the cause of the alleged constitutional violation. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002). The Tenth Circuit "will not hold a municipality 'liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers.'" *Id.* at 1317–18 (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)).

Here, as previously determined, Plaintiff has failed to demonstrate that the individual Defendants' conduct amounted to a constitutional violation. This conclusion is sufficient to support the finding of qualified immunity. If it is determined that Plaintiff's claims fail under the first prong of qualified immunity – whether the conduct violated Plaintiff's constitutional rights – then no claim can be asserted against the entity.

### C.   Plaintiff Fails to State a Plausible Claim

As to Plaintiff's claim that the County failed to properly train, supervise, and/or discipline its employees regarding lawful searches over private residence, even if Plaintiff were able to prevail that the drone flight violated his Fourth Amendment rights, the absence of authority

24

establishing that the drone flight (or similar drone flights) violated the Fourth Amendment prevents Plaintiff from plausibly pleading Montezuma County's actual or constructive knowledge of such law and, accordingly, its deliberate indifference to such law. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (a plaintiff must show that "the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury"); *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (the deliberate indifference standard may be satisfied "when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm"). *See also Erickson v. City of Lakewood,* 489 F. Supp. 3d 1192, 1205 (D. Colo. 2020).

As such, the 1AC fails to state a plausible claim against the County.

## CONCLUSION

WHEREFORE, for the reasons set forth above, Defendants request an order of dismissal of Plaintiff's Claims and an award of such costs and fees as are allowed by law.

Respectfully submitted,


Date:  March 17, 2023                    s/ Gordon L. Vaughan
                                         Gordon L. Vaughan
                                         Michaela S. Morrissey
                                             VAUGHAN & DeMURO
                                             111 South Tejon, Suite 545
                                             Colorado Springs, CO 80903
                                             (719) 578-5500 (phone)
                                             gvaughan@vaughandemuro.com (e-mail)
                                             mmorrissey@vaughandemuro.com (e-mail)
                                         ATTORNEY FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of March, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

**Tyrone Glover, Esq.**
tyrone@tyroneglover.com

**Helen Oh, Esq.**
helen@tyroneglover.com

and I hereby certify that the foregoing was placed in the U.S. Mail, postage prepaid, and addressed to the following:

[None]

s/ Gordon L. Vaughan
Gordon L. Vaughan