IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02175

**CHRISTOPHER TUCK,**

Plaintiff,

v.

**SHERIFF STEVEN D. NOWLIN,** in his individual capacity;
**LIEUTENANT JEFFREY COPELAND,** in his individual capacity;
**DETECTIVE JOHN HAYNES,** in his individual capacity;
**THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF MONTEZUMA,** in its official capacity.

Defendants.

---

## SECOND AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Christopher Tuck, by and through his attorneys Tyrone Glover and Helen Oh of TYRONE GLOVER LAW, LLC, respectfully submits this First Amended Complaint and Jury Demand and alleges as follows:

### INTRODUCTION

"... drones are qualitatively different from airplanes and helicopters: they are vastly smaller and operate within little more than a football field's distance from the ground. A drone is therefore necessarily more intrusive into a person's private space than would be an airplane overflight. . . . [U]nlike airplanes, which routinely fly overhead for purposes unrelated to intentionally-targeted surveillance, drone overflights are not as commonplace, as inadvertent, or as costly. In other words, drones are intrinsically more targeted in nature than airplanes and intrinsically much easier to deploy. . . . [G]iven their maneuverability, speed, and stealth, drones are—like thermal imaging devices—capable of drastically exceeding the kind of human limitations that would have been expected by the Framers not just in degree, but in kind."

1

*Long Lake Twp. v. Maxon*, 336 Mich. App. 521, 2021 Mich. App. LEXIS 1819 (J. Janson).

1.   This action seeks accountability from Defendants who conducted a warrantless and unlawful drone search of Plaintiff's property to search for possible marijuana cultivation without probable cause.

2.   Without a search warrant, consent, exigent circumstances, or any other exception to the warrant requirement, Defendants flew the drone above Plaintiff's property, where the drone took numerous photos of the property while trespassing on the property.

3.   From reviewing and zooming into the illegally obtained drone photos, Defendant Copeland received authorization for two search warrants of Mr. Tuck's property. Defendant Copeland submitted four warrant affidavits total, three of which were for Plaintiff's property.

4.   The first search warrant was authorized, but not executed. The second search warrant was executed on Mr. Tuck's property, where his home, vehicles, curtilage, gardens, and outbuildings were searched.

5.   Defendant Copeland recklessly made material misrepresentations, blatant errors, and omissions in the affidavits.

6.   Defendant Board of County Commissioners of the County of Montezuma (hereinafter, "Montezuma County") maintained a custom, policy, and practice of conducting illegal searches by way of operating warrantless drone searches over private property without probable cause.

7.   The numerous illegal searches of Plaintiff's property and his subsequent prosecution caused Plaintiff significant damages.

## JURISDICTION AND VENUE

8. Jurisdiction over Plaintiff's federal claim is conferred upon this Court pursuant to 28 U.S.C. §1331, as claims are brought pursuant to 42 U.S.C. § 1983, in addition to the Colorado Constitution. This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Jurisdiction supporting Plaintiffs' claim for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1988 and C.R.S. § 13-21-121.

9. Venue is proper in the District of Colorado pursuant to 28 U.S.C. §1391(b). All of the events alleged herein occurred within the State of Colorado.

## PARTIES

10. At all times relevant to this Complaint, Plaintiff Christopher Tuck was a citizen and resident of the State of Colorado.

11. At all times relevant to this Complaint, Defendant Lieutenant Jeffrey Copeland was a supervisory employee of Montezuma County Sheriff's Office (MCSO) acting within the scope of his official duties and employment and under color of state law in his capacity as a MCSO Lieutenant and Patrol Division Supervisor. At all relevant times, Defendant Copeland was a citizen of the United States and resident of the State of Colorado.

12. At all times relevant to this Complaint, Defendant Detective John Haynes (6038) was acting within the scope of his official duties and employment and under color of state law in his capacity as a MCSO Detective and Analyst of Unmanned Aerial Surveillance (UAS) Operations. At all relevant times, Defendant Haynes was a citizen of the United States and resident of the State of Colorado.

13.  At all times relevant to this Complaint, Defendant Sheriff Steven Nowlin was an official policymaker of MCSO and acting within the scope of his official duties and employment and under color of state law in his capacity as MCSO Sheriff. At all relevant times, Defendant Nowlin was a citizen of the United States and resident of the State of Colorado.

14.  Defendant Board of County Commissioners of the County of Montezuma ("Montezuma County") is a political subdivision of the State of Colorado. The Board of County Commissioners of the County of Montezuma is the designation used to sue Montezuma County pursuant to C.R.S. § 30-11-105. The Board is the governing body for Montezuma County, and enforces local and state law through its law enforcement agencies, including the MCSO, and is deemed a suable entity within the meaning of 42 U.S.C. § 1983.

## FACTUAL ALLEGATIONS

### Plaintiff Christopher Tuck's Background and Property

15.  Plaintiff Christopher Tuck is sixty-three years old and at the time of these allegations resided at 26956 Road R in Dolores, Colorado – a rural, residential, and more secluded area.

16.  Mr. Tuck is an experienced horticulturist who enjoys botanical research. He has grown a large variety of plants and flowers as a personal hobby for over forty years.

17.  Mr. Tuck's property was twenty-three acres large and fully enclosed with a fence on almost all parts of his property. The only area of his property without a fence was one-tenth of a mile long to the east of his living quarters where his land met a private pond. The unfenced area was partially obstructed by large trees and an irrigation canal.

18.  Outlined in white in the screenshot below was Mr. Tuck's property at 26956 Road R. The

red lines delineate other property lines, including ponds and roads. The lime green lines signify public roads.



View from Montezuma County Arc GIS map, available on the Montezuma County website.

19.   The Big Corkscrew Ditch irrigation canal ran along the north end of Mr. Tuck's property line, servicing neighboring farms during farming season. An easement canal delineated the entire west side of Mr. Tuck's property.

20.   Mr. Tuck possessed a reasonable expectation of privacy in all areas of his property.

21.   Ten to forty-foot native cedar trees and sagebrush densely covered the curtilage of Mr. Tuck's house and much of his property. These trees largely obstructed the view from many parts of the public road to his residence.

22.   Mr. Tuck had a 700-foot-long pipe-gated driveway that provided the only entrance from the public road to his house.

23.   About 250 feet up this driveway was a set of cable gates that again blocked entry from the

driveway to his home.

24. Plaintiff had a reasonable expectation of privacy in his yard, marijuana gardens, and greenhouse, which were within the curtilage of his home. One garden was 15-feet away from his house and the other garden was 70-feet away from his house. The greenhouse was eighty feet from his house.

25. Mr. Tuck had a reasonable expectation of privacy to engage in the lawful activity of possessing or cultivating marijuana in Colorado.

26. Mr. Tuck had a reasonable expectation of privacy to engage in the lawful activity of possessing or cultivating hemp.

27. Mr. Tuck had a reasonable expectation of privacy to not be surveilled or photographed by an unmanned aerial system trespassing on his property for the government's purpose of criminal investigation.

28. It was highly uncommon for Mr. Tuck to see or hear airplanes or helicopters fly over his property.

29. In 2018, the federal government enacted the Agricultural Improvement Act of 2018, also known as the Farm Bill, which removed hemp from schedule I of the Controlled Substances Act and developed a regulatory program for the oversight of hemp production. Agricultural Improvement Act of 2018, Pub. Law 115-334, 115th Congress, H.R. 2 (2018).

30. Hemp and marijuana are the same plant – cannabis sativa – and look and smell indistinguishable. The defining difference between the two is the level of THC (tetrahydrocannabinol) contained. Hemp must contain .3% or less THC.

31. Cannabis plants contain more than 100 compounds, also called cannabinoids. These cannabinoids include THC as well as many other active compounds.

32. Mr. Tuck planted his cannabis gardens around August 2, 2020, knowing they would be harvested early October, which is commonly when Colorado has its first freeze.

33. As seen by the size of Mr. Tuck's plants, which were between six to twenty-four inches in height, the plants contained THC levels below that of which is legally considered marijuana. As such, they were legally considered hemp.

34. Mr. Tuck grew hemp for his personal interest in phenotype hunting for CBD and cancer research, as many of his family members passed away from cancer. From his research, he found an increasing number of studies demonstrated the possibility of certain cannabinoids impacting the growth of cancer.

35. Phenotype hunting is the process of selecting phenotypes of a specific plant variety for cultivation to identify plants with exceptional qualities which can be used for specific purposes.

36. His plants were grouped and tagged for identification, and he recorded the phenotype data of his plants as he grew them.

37. Despite his legitimate interest in hemp cultivation, Mr. Tuck did not possess the necessary hemp production licensure from the United State Department of Agriculture to cultivate such plants.

### The Lack of Probable Cause and the Warrantless and Unlawful Drone Search of Mr. Tuck's Property

38. During the week of August 15, 2020, a confidential informant ("CI") who lived within the 26000 block of Road R and wished to remain anonymous told Defendant Lieutenant Jeffrey

Copeland that he/she believed that large amounts of marijuana were being unlawfully cultivated from two possible directions or properties.

39.   Upon information and belief, the CI resided at 26870 Road R, Dolores, Colorado.

40.   The first property CI pointed out to Defendant Copeland was about one-fifth of a mile northwest of the CI's house. The second property – Mr. Tucks' – was about a quarter mile east of the CI's house.

41.   The source told Defendant Copeland that when the wind blew from the direction of these properties, it smelled of marijuana. The source pointed out to Defendant Copeland where the two properties were.

42.   Defendant Copeland visually observed the properties from the public roadway.

43.   Defendant Copeland alleged that, from the public roadway, he observed a greenhouse on the first property and that this greenhouse contained marijuana plants that were sticking out of the top of the greenhouse. Defendant Copeland counted six plants in the greenhouse, which was within the legal limit.

44.   When viewing Mr. Tuck's property from the public roadway, Defendant Copeland could not see Mr. Tuck's house, gardens, alleged marijuana plants, or anything illegal.

45.   The CI pointed out to Defendant Copeland what appeared to be the top half of a green-house-type building on the southwest side of Mr. Tuck's home. Defendant Copeland could not see whether it was in fact a greenhouse, or what, if anything the structure contained.

46.   Despite Defendants' efforts, at no time did Defendant Copeland, nor any Defendant see marijuana plants or anything illegal on Mr. Tuck's property prior to conducting the warrantless

drone surveillance above Mr. Tuck's property.

47. At no time did Defendant Copeland nor any defendant smell marijuana coming from Mr. Tuck's property.

48. On August 24, 2020, without reasonable suspicion or probable cause to believe that Mr. Tuck was illegally cultivating marijuana, Defendants Copeland and Haynes conducted a warrantless search of Mr. Tuck's property through the use of a MCSO drone.

49. That same day, Defendant Haynes submitted a Drone Operational Plan for the warrantless drone search of Mr. Tuck's property. The stated justification for the drone search was, "[d]ue to possible unlawful marijuana grow operations occurring at 26956 Rd. R, it is necessary to gather further information." No further justification for the search was given.

50. Defendant Nowlin reviewed and signed off on the drone operational plan of Mr. Tuck's property that same day.

51. The drone was a DJI Mavic Pro Platinum which diagonally measures to thirteen (13) inches in size, weighs 1.62 pounds, and promises a 60% noise reduction from its predecessor, making it incredibly stealthy. The drone is equipped with a 12.71-megapixel camera with a 35-millimeter lens, 78.8- degree Field of View, WIFI, various still photography modes, and various video recording modes. The image size of its photographs are 4000 x 3000. The drone can be remote controlled and contains a live app view to see the drone's flight in real time in high definition.

52. An image size of 1280 x 720 is considered high definition (HD) and is commonly used in photography and film.

53. Considering the drone's advanced camera specifications, that it is unmanned, and can fly a pre-programmed path, drone photos are captured with extreme clarity and high-definition zoom capability.

54. Defendant Copeland directed the surveillance operation to capture aerial photos of Mr. Tuck's property using the drone, which was piloted by Defendant Detective John Haynes.

55. Defendants Copeland and Haynes were both present on the CI's property at 26870 Road R, where they launched the drone with CI's consent.

56. The drone followed a pre-scheduled flight path that was plotted by Defendants Copeland and Haynes to circle above and around Mr. Tuck's property from around 390 feet above the ground.



The drone's flight path on August 24, 2020

57. Defendants Copeland and Haynes knew that, in accordance with Colorado law, the

ownership of space above the lands and waters of this state is declared to be vested in the

owner(s) of the surface beneath, subject to the right of flight of aircraft[1].

58.  Defendants Copeland and Haynes knew that much of the plotted drone path was directly

above Mr. Tuck's property.



The red lines delineate Mr. Tuck's property

59. Without  probable  cause,  a  warrant,  consent,  or  exigent  circumstances,  Defendants

Copeland and Haynes knowingly and intentionally used a drone to trespass over Mr. Tuck's

property to capture photos of and search his property for illegal cultivation of marijuana.

---

[1] Pursuant to C.R.S. § 41-2-101 (1), "Aircraft" means any vehicle used or designed for carrying any person, persons, or freight and used or designed for aviation or flight in the air in control of a crew member, whether it is or is not a certificated vehicle under the rules of the federal aviation administration, and the federal department of transportation, or its successor.

60. Defendant Haynes flew the drone through an iPad, which also displayed the drone's camera view and observations in real time.

61. The drone took at least twenty (20) aerial photos of Mr. Tuck's property from 390 feet in the air.

62. The majority of the photos taken were while the drone was trespassing above Mr. Tuck's property.

63. With the use of the drone, Defendants Copeland, Haynes, and Nowlin (collectively, the "Individual Defendants") committed an unlawful entry over Plaintiff's property.

64. The drone surveillance conducted by Individual Defendants of Mr. Tuck's property, on his property, and capturing photographs of his property to possibly find illegal marijuana cultivations constituted a search under the Colorado and United States Constitutions.

65. The drone recorded its GPS location every 10th of a second or every 2/10ths of a second.

66. The drone flight lasted approximately seven minutes.

67. After the drone returned from its flight path, Defendant Haynes provided Defendant Copeland with the photos taken by the drone, and Defendant Copeland reviewed them on a computer.

68. Using a magnification tool to zoom in on the photos, Defendant Copeland saw what appeared to be marijuana plants growing in two small gardens on Mr. Tuck's property.

69. Defendant Copeland named one plot of marijuana plants the *West Garden* and the other plot the *East Garden.*

70. The East Garden was twenty-feet wide by thirty-feet long, and fifteen feet from Mr.

Tuck's house. The West Garden was fifteen-feet wide by twenty-feet long, and seventy feet from Mr. Tuck's house. The plants in the West Garden were all potted.

71. Mr. Tuck's marijuana plants were between six to twenty-four inches in height.

72. Both of the marijuana gardens were surrounded by large trees and sagebrush, where the trees and sagebrush provided a natural sight barrier, so his gardens were hidden from view.

73. Within approximately forty-five feet from Mr. Tuck's house was a pool. Mr. Tuck used this pool in the summertime.

74. Within approximately fifty-five feet from Mr. Tuck's house and fifteen feet from the west garden, Mr. Tuck kept his Boston Whaler boat.

75. Without zooming into the photos captured by the drone, Defendants Copeland and Haynes could not observe or discern what appeared to be marijuana plants on Mr. Tuck's property.

76. Defendants' warrantless search of Mr. Tuck's property through the use of a drone violated Mr. Tuck's reasonable expectation of privacy.

77. Defendants' warrantless search of Mr. Tuck's property through the use of a drone was unreasonable and without probable cause in violation of Mr. Tuck's constitutional rights.

78. Using the illegally obtained drone photos, between August 27, 2020 and October 6, 2020, Defendant Copeland submitted four search warrant affidavits for Mr. Tuck's property, all of which were authorized by Magistrate Judge JenniLynn Everett Lawrence. Of the four search warrants, the first three warrant affidavits contained material misrepresentations, and only the second and fourth search warrants were executed on Mr. Tuck's property.

### The First Search Warrant: Authorized but Not Executed
### (Search Warrant 20-58)

79. On August 27, 2020, Defendant Copeland submitted an affidavit for a search warrant for 26956 Road R, Cortez, Colorado, County of Montezuma. Affiant Copeland stated that the 26956 Road R address was listed under the name Robyn Lynn Tuck with an active electric account with Empire Electric under the name of Christopher Tuck.

80. Mr. Tuck's address is incorrectly listed in the affidavit as in the city of "Cortez" instead of the town of "Dolores."

81. Defendant Copeland stated in the affidavit that a source of information otherwise known to Copeland but who wishes to remain anonymous (hereinafter "CI"), told Copeland that they believed large amounts of marijuana were being unlawfully cultivated from two different properties located in opposite directions of the CI because they could smell marijuana when the wind blew from the directions of the properties. The affidavit does not establish any time frame for when the CI last smelled marijuana from either property.

82. Defendant Copeland swore that the CI pointed out what appeared to be the top half of a greenhouse-type building on the second property, 26956 Road R in Montezuma County. There was nothing further written about the CI's beliefs about the greenhouse or the bases for those beliefs.

83. As sworn in the affidavit, using only this information provided by the CI, Defendant Copeland directed a surveillance operation using a drone piloted by Defendant Haynes.

84. In the affidavit, Defendant Copeland intentionally misrepresented that the drone flew *outside* the *home's curtilage and property* to take still photos of the property.

14

85. This deliberate falsehood was stated with knowledge that the drone's pre-planned flight path, which he and Defendant Haynes created, flew directly on and over Mr. Tuck's property for at least half of the flight path.

86. Relying on what Defendant Copeland observed from the zoomed-in drone photographs, Copeland described the East and West Gardens and that they appeared to depict illegal cultivations of around 210 total marijuana plants.

87. Attached to the warrant affidavit were three photos of Mr. Tuck's property taken by the drone: the first photo showed Mr. Tuck's residence and yard with a view of both gardens, the second photo was a zoomed-in version of the first photo that magnified just the East Garden, and the third photo was a zoomed-in version of the first photo that magnified the West Garden. The first/main photo was taken while the drone was trespassing above Mr. Tuck's property, and the other two zoomed-in photos show each garden at an estimated 200 times magnification in high definition.

88. Nowhere in the affidavit did Defendant Copeland state that he smelled marijuana coming from Mr. Tuck's property.

89. Nowhere in the affidavit did Defendant Copeland state that, prior to conducting the drone search, he observed what he believed to be marijuana plants on Mr. Tuck's property, or any illegal activity.

90. There was nothing in the affidavit concerning Defendant Copeland's personal knowledge of the facts upon which the informant based their information.

91. There was nothing in the affidavit describing the circumstances from which Defendant

Copeland could conclude that the informant was credible or reliable.

92. Without the illegally obtained drone photos and information obtained therefrom, the warrant is invalid.

93. Defendant Copeland's intentional misrepresentation was material, such that if he had admitted that the drone trespassed without a warrant on Mr. Tuck's property, it would have vitiated probable cause.

94. The affidavit lacked in probable cause and is constitutionally deficient in violation of Mr. Tuck's constitutional right to be free from unreasonable searches.

95. Despite the affidavit's deficiencies, on August 27, 2020, Magistrate Judge JenniLynn Everett Lawrence authorized the search warrant of 26956 Road R, *Cortez*, Colorado (a location that does not exist) authorizing the search of the home, vehicles within the home's curtilage, persons within the home or curtilage, exterior property of the home, outbuildings, and *any closed containers* that may contain marijuana.

96. Including an unlimited search of the home along with the search of any closed containers that may contain marijuana was unconstitutionally broad and unsupported by probable cause.

97. Defendant Copeland did not execute search warrant 20-58 on Mr. Tuck's property.

### The Second Search Warrant: Authorized and Executed on Mr. Tuck's Property (Search Warrant 20-59)

98. On September 1, 2020, Defendant Copeland submitted a second search warrant affidavit for Mr. Tuck's property, which was largely the same as the first.

99. Defendant Copeland made largely the same sworn statements regarding what he was told by the informant.

100.    As with the first search warrant affidavit, Defendant Copeland did not state any other information describing his personal knowledge of the facts upon which the CI based their claims, nor did he describe the circumstances from which he could conclude that the informant was credible or reliable.

101.    Unlike affidavit 20-58, where Defendant Copeland stated that he had *training and experience* in the aerial spotting of outdoor clandestine marijuana cultivations, in affidavit 20-59, he deleted the word "training" and stated that he had experience in the aerial spotting of outdoor clandestine marijuana cultivations.

102.    Nowhere in the affidavit did Defendant Copeland state that he smelled marijuana coming from Mr. Tuck's property or that he observed what he believed to be marijuana plants on Mr. Tuck's property, or any illegal activity.

103.    Defendant Copeland again intentionally misrepresented that he directed the drone to fly *outside the home's curtilage and property* to take multiple still photos of the property.

104.    Defendant Copeland explained that while reviewing the drone photographs, he saw what appeared to be two marijuana gardens on the property.

105.    Despite relying heavily on what the drone photos purported to depict in order to establish grounds for issuing the search warrant, unlike the affidavit for 20-58, Defendant Copeland failed to attach any photos to affidavit 20-59.

106.    The CI's beliefs that marijuana was possibly being cultivated on Mr. Tuck's property based on the smell of marijuana coming from the direction of Mr. Tuck's property a quarter-mile away, without stating any time frame for when the CI smelled marijuana, while seeing the top of

a possible greenhouse on the property are not sufficient to indicate probable cause that Mr. Tuck was cultivating marijuana on his property.

107.    Without the illegally obtained drone photos and information obtained therefrom, the warrant was facially invalid.

108.    Defendant Copeland's intentional misrepresentation was material, such that if he admitted that the drone search was without a valid warrant and trespassed on Mr. Tuck's property, it would have vitiated probable cause.

109.    The affidavit lacked in probable cause and is constitutionally deficient in violation of Mr. Tuck's constitutional rights to be free from unreasonable searches.

110.    Copeland stated that after viewing the drone photos where he identified the marijuana gardens, he searched Mr. Tuck's address with the Department of Agriculture and it was not listed as registered for hemp cultivation. He then had the property researched by the Colorado Bureau of Investigation ("CBI") Marijuana Enforcement Division, who found no license for "Caregiver Cultivation Association."

111.    Copeland stated he also met with CBI Marijuana Enforcement Division Agent Jeff Brown, who checked with other sources of information available only to the CBI Marijuana Enforcement Division and who confirmed that Mr. Tuck, nor the property were registered with the Department of Agriculture for hemp cultivation, or the Marijuana Enforcement Division for commercial marijuana cultivation.

112.    Magistrate Judge Lawrence nonetheless authorized search warrant 20-59, authorizing the search of everything listed by Defendant Copeland except for the search of any closed containers that may contain marijuana.

113.    On September 2, 2020 at 8:55 a.m., Individual Defendants executed search warrant 20-59 on Mr. Tuck's residence at 26956 Road R with over two dozen officers from the MCSO and several Colorado Bureau of Investigation officers.

114.    For four hours, Defendants Copeland, Nowlin, and other MCSO officers searched Mr. Tuck's property, vehicles, outhouses, yard, and gardens. They took photos of his property, seized samples of his plants, and destroyed his remaining marijuana plants.

115.    During the search, Mr. Tuck was humiliated as dozens of heavily armed officers searched and raided his home while he was detained in handcuffs wearing nothing but his underwear.

116.    Mr. Tuck nonetheless was very compliant and respectful with the officers.

117.    After an hour in handcuffs, Mr. Tuck was uncuffed by officers who appreciated his compliant and helpful demeanor.  Mr. Tuck remained on the property without issue.

118.    Mr. Tuck was issued a summons for the unlawful cultivation of more than thirty marijuana plants, a class three drug felony in violation of C.R.S. 18-18-406.

119.    The grounds for probable cause from the affidavit for search warrant 20-59 was grounded upon the information obtained from the illegal drone search. Without the illegally obtained information, the search warrant is invalid.

120.    Search warrant 20-59 lacks probable cause and is constitutionally deficient.

121.   Accordingly, the September 2nd search of Mr. Tuck's property and seizure of items therein violated Mr. Tuck's constitutional right to be free from unreasonable searches and seizures.

### The Third Search Warrant: Authorized but not Executed (20-60)

122.   The same day, after the 20-59 search warrant was executed, Defendant Copeland submitted a third search warrant affidavit based on the items earlier searched and seized from Mr. Tuck's property. Search warrant 20-60 greatly expanded the items sought to be searched and seized.

123.   Judge Lawrence again authorized search warrant 20-60 shortly thereafter. Notably, Judge Lawrence found that there was "probable cause to believe that, in, on, or upon Mr. Tuck's address was evidence of violations of C.R.S. 18-12-108 Possession of Weapons by Previous Offender and/or C.R.S. § 18-2-201 Criminal Attempt (C.R.S. § 18-3-102 Murder in the First Degree) which constitute property which has been stolen or embezzled. . . ."

124.   Judge Lawrence struck several of the expanded items to be searched, while authorizing the search and seizure of desktop and laptop computers and cell phones.

125.   Mr. Tuck was never investigated for, nor charged with possession of a weapon by a previous offender, or criminal attempt/murder in the first degree.

126.   Despite this glaring misstatement and lack of probable cause that Mr. Tuck possessed evidence of violations of the aforementioned offenses, Judge Lawrence authorized the search warrant.

127.   For a third time, Defendant Copeland recklessly included materially false statements in his affidavit.

128.   Because probable cause was grounded upon the information obtained from the illegal search conducted on Mr. Tuck's property on September 2, 2022, without the illegally obtained information, search warrant 20-60 lacks any indicia of probable cause and is constitutionally invalid.

129.   Defendant Copeland never executed this search warrant.

### Mr. Tuck's Prosecution and Dismissal of Criminal Case

130.   The acts described herein were done by Defendants intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Mr. Tuck's constitutionally protected rights.

131.   As a result of Individual Defendants' conduct, Mr. Tuck was prosecuted for the cultivation of more than thirty marijuana plants under C.R.S. § 18-18-406 (3)(A)(I)(III)(A), a level three drug felony.

132.   Mr. Tuck's marijuana plant samples were tested to confirm the presence of THC, but they were not tested to confirm the levels of THC they contained. The CBI laboratory report reflects that no plant samples taken from Mr. Tuck were quantitatively tested to assess the levels of THC contained.

133.   On June 30, 2021, Mr. Tuck's criminal defense attorney filed a Motion to Suppress Evidence regarding the evidence obtained from the warrantless drone search. A hearing was held on February 28, 2022.

134.   During the hearing, Defendant Copeland testified that the only information he relied upon to justify conducting the warrantless drone search was the CI's allegations that he could smell marijuana coming from the east and west of his property. He also testified that prior to conducting the drone search, he could not smell marijuana coming from Mr. Tuck's property, nor did he observe anything illegal on Mr. Tuck's property.

135.   Defendant Haynes testified that the purpose of using the drone to search Mr. Tuck's property was to see if further criminal investigation was needed, not because Defendants had probable cause to believe that Mr. Tuck was committing any crime.

136.   The prosecutor stated that for purposes of the motion hearing, without the information obtained from the drone, the warrant was facially insufficient.

137.   On March 29, 2022, upon motion by Mr. Tuck's criminal attorney, Montezuma District Court Judge Todd Jay Plewe granted Mr. Tuck's Motion to Suppress All Evidence. The Court found that without the information obtained during the drone flight, which was conducted without a search warrant, the search warrant application would have been insufficient. The Court also found that the MCSO trespassed on Mr. Tuck's property by flying a drone over Mr. Tuck's property at 390 feet and taking photographs. *Order Granting Motion to Suppress Evidence, People v. Tuck*, 2020CR326.

138.   In granting Mr. Tuck's Motion to Suppress all items seized pursuant to the search warrant issued on September 1, 2020, the court further found that the unlawful entry was pre-planned, intentional, and programmed, and that the officers did not act in good faith, as Colorado law makes clear that intrusion on the space above the surface of land and beneath the right

of flight of aircraft, without permission of the owner is a trespass, which law enforcement officials are presumed to know. *Id.* (citing to C.R.S. § 41-1-107).

139.   On April 5, 2022, after fighting his criminal case for 580 days, Mr. Tuck's case was dismissed by motion of the prosecution.

140.   As a result of the illegal drone search, subsequent search of Mr. Tuck's home, yard, outhouses, and vehicles, and Mr. Tuck's prosecution, Mr. Tuck suffered significant damages.

141.   As a result of this case, Mr. Tuck experienced extreme stress, high blood pressure, humiliation, and emotional distress.

### Montezuma County's Unconstitutional Custom, Policy, and Practice

142.   The violations of Mr. Tuck's constitutional rights are a direct result of, and caused by Montezuma County's custom, policy, and practice of conducting warrantless drone searches without probable cause and in violation of the Fourth Amendment.

143.   Defendants' warrantless drone search of Mr. Tuck's property was pursuant to widespread custom, policies, and/or practices of conducting warrantless drone searches without probable cause by trespassing onto the search subject's property and taking photos of the property.

144.   MCSO's Search policy 311.3 states that, aside from obtaining a valid warrant, exceptions permit a warrantless search, such as: valid consent, incident to a lawful arrest, community caretaking, vehicles searches under certain circumstances and exigent circumstances. The policy also states that other state and federal laws recognize law enforcement activities that do not require a warrant, such as observations of activities and property located in public areas.

23

145.   MCSO policy 605 on UAS (Unmanned Aerial Systems) Operations states, "[a]bsent a warrant or exigent circumstances, operators and observers shall adhere to FAA altitude regulations and shall not intentionally record or transmit images of any location where a person would have a reasonable expectation of privacy (e.g., residence, yard, enclosure)."

146.   Policy 605 also states, "[u]se of vision enhancement technology (e.g., thermal and other imaging equipment not generally available to the public) is permissible in viewing areas only where there is no expectation of privacy interest or when in compliance with a search warrant or court order."

147.   Policy 605 states, "UAS video surveillance equipment shall not be used: [t]o conduct random surveillance activities."

148.   Policy 605 requires the implementation of a system for public notification of UAS deployment.

149.   Defendants Nowlin, Copeland, and Haynes routinely and purposefully violated MCSO's written policies and proximately caused the harm to Mr. Tuck by conducting warrantless drone searches without probable cause knowing that the drones would fly directly on and above Mr. Tuck's and other residents' private property, including flying over and obtaining detailed images of their yards, homes, and curtilage, where they have a reasonable expectation of privacy.

150.   MCSO policies on UAS Operations stated that the Sheriff is to be notified of all requests for UAS use and prior to written authorization.

151.   Defendant Nowlin sets official policies as Sheriff and is a final policymaker for

Defendant Montezuma County.

152.    Defendant MCSO Sheriff Steven Nowlin reviewed all drone operational plans prior to any drone use pursuant to MCSO's written policy regarding the use of UAS.

153.    According to MCSO's policy manual, as Patrol Division Supervisor, Defendant Copeland is a supervisory employee responsible for hiring, training, planning, assigning, and directing work in accordance with MCSO policies and procedures. He is also responsible for answering officers' questions regarding law, procedures, case classification, and how it is applied to given situations, and reviewing officer reports to ensure they are complete and accurate.

154.    MCSO has a UAS Operations team for which Defendant Copeland was appointed by Sheriff Nowlin to be the Program Coordinator and Defendant Haynes is the UAS program drone pilot.

155.    As the program coordinator, Copeland is responsible for the management of the UAS program, ensuring policies and procedures conform to current laws, regulations, and best practices, among other responsibilities.

156.    Defendant Nowlin reviewed and authorized the August 24, 2020 drone operational plan over Mr. Tuck's property, as confirmed in writing. Defendants Copeland and Haynes were assigned to the operation, and Defendant Nowlin approved and signed off on the operational plan that same day.

157.    In the August 24, 2020 drone operational plan to surveille Mr. Tuck's property, Defendant Haynes alleged that "[d]ue to possible unlawful marijuana grow operations occurring at 26956 Rd. R, it is necessary to gather further information. On 8/24/20 at approximately 1500

hours, Detective Haynes will launch the Mavic Pro Platinum from open fields in the area of 31524 Rd S. The Mavic Pro Platinum will be operated over open fields related to this and other addresses and take aerial photographs from approximately 390 feet above the ground. At no time shall any photographs be taken at an altitude less than 350 feet above the ground."

158. Defendant Nowlin also reviewed, authorized, and signed a May 9, 2020 drone operational plan over another Montezuma County resident's property.

159. On May 9, 2020, Defendant Nowlin reviewed and authorized Defendant Haynes' operational plan for the use of a drone to surveille and take photos of a private property located at 31524 Rd. S in Cortez, Colorado. Under nearly identical circumstances as Mr. Tuck's case, without a search warrant, Defendant Haynes was authorized by Defendant Nowlin to launch the drone from the open fields directly on the 31524 Rd. S property and take aerial photos from approximately 390 feet above the ground for mere suspicion of possible unlawful marijuana growing operations.

160. Defendant Nowlin confirmed via email on February 17, 2021 that he personally received, reviewed, and approved the May 9, 2020 and August 24, 2020 drone operational plans.

161. As indicated by the drone operational plan documents, Defendant Nowlin reviewed and authorized drone searches knowing that they would fly and search directly above the properties in question, and was deliberately indifferent to, and acted in reckless disregard of Mr. Tuck's and others' constitutionally protected rights to be free from unreasonable searches of their property.

162. In 2019 and 2020, Defendant Nowlin and the MCSO conducted at least twelve raids

on marijuana cultivation operations, many using the assistance of UAS to first warrantless sur-

veille and search homes, properties, and curtilage for potential illegal marijuana.

163.    Detective Haynes participated in or was privy to around twelve UAV operations re-

garding marijuana raids in Montezuma County where he employed the same unlawful means of

drone surveilling and searching properties to obtain detailed images of their homes, yards, and

curtilage without first obtaining a warrant.

164.    In the motion hearing in the criminal case, Defendant Haynes testified that on August

24, 2020 alone, he completed multiple drone operational plans to surveille multiple properties

in the same fashion as Mr. Tuck's.

165.    Defendants Haynes, Copeland, and Nowlin repeatedly conducted warrantless drone

searches and surveillance authorizing the drone to trespass on and take photos of private resi-

dences, including their yards, enclosures, and curtilage for the purpose of investigating and

searching the property for illegal marijuana cultivation.

166.    Despite knowing that Defendants were committing unlawful warrantless searches by

trespassing on and taking photos of private properties for the purpose of criminal investigation,

Defendant Nowlin routinely authorized and ratified illegal and warrantless drone searches.

167.    Defendants Nowlin and Copeland were required to possess the training and

knowledge regarding how to conduct constitutional drone searches under the Fourth Amend-

ment and Colorado Constitution.

168.    Defendants Nowlin, Copeland, and Montezuma County were responsible for training

and supervising employees regarding the use of UAS.

169.   Defendants Nowlin, Copeland, and Montezuma County failed to train its officers in conducting constitutional searches of residents' homes and private property through the use of drones, despite its repeated actions in conducting warrantless drone searches and the obvious need for such training.

170.   Defendants Nowlin, Copeland, and Montezuma County's repeated and widespread failure to adhere to their own UAS policy to unconstitutionally search and surveille individuals' homes, yards, enclosures, and curtilage was knowing and intentional, and amounted to a widespread custom, policy, and practice.

171.   Defendants Nowlin and Copeland have not implemented a system for public notification of UAS deployment because they frequently and covertly search and surveille residents' homes, yards, and curtilage for potential illegal marijuana cultivation.

172.   The recurrence of the same violations with respect to Montezuma County residents indicates an intentional refusal to preserve the constitutional rights of its residents.

173.   Defendants Nowlin's, Copeland's and Montezuma County's failure to possess and provide adequate training and policies that were obviously needed constituted deliberate indifference.

174.   Defendants Nowlin and Montezuma County acted with deliberate indifference to the constitutional rights of county residents by authorizing, both explicitly and implicitly, the warrantless drone searches of Mr. Tuck's and dozens of other county residents' homes, curtilage, and yards for possible illegal marijuana cultivation without reasonable suspicion or probable cause.

175.   Defendants Nowlin and Montezuma County knew or should have known that its acts or omissions in this regard were substantially certain to cause MCSO officers to violate individuals' constitutional rights, like Mr. Tuck's, and it consciously or deliberately chose to disregard this obvious risk of harm in adhering to its customs and practices of unreasonable drone searches.

176.   The actions of Defendants were unreasonable and unlawful and violated Plaintiff's constitutional rights, causing Mr. Tuck injury and other damages.

177.   The acts described herein were done by Defendants intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Plaintiff's constitutionally protected rights.

178.   The acts or omissions of Officer Defendants were the moving force behind, and the proximate cause of, injuries sustained by Plaintiff.

179.   Defendant Montezuma County had a custom and practice of deliberately ignoring their own policies by trespassing on and taking photos of private residences, yards, and enclosures without first obtaining a search warrant.

180.   The actions of Officer Defendants as described herein deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitutions of Colorado and the United States and caused him other damages.

### STATEMENT OF CLAIMS FOR RELIEF

### First Claim for Relief
C.R.S. § 13-21-131
Colo. Const. Art. II, Section 7 — Unlawful Entry and Search

(Against Defendants Copeland, Haynes, and Nowlin)

181.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

182.    Plaintiff had a constitutionally protected interest under Colorado Constitution, art. II § 7 to be secure in his person against unreasonable searches of his residence and property.

183.    The Individual Defendants acted under color of state law and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

184.    The Individual Defendants were "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

185.    Plaintiff had a legitimate expectation of privacy in all parts of his property, including his home, yard, gardens, and greenhouse.

186.    Plaintiff had a legitimate expectation of privacy not to be surveilled or his property photographed by a drone flying on or over his property.

187.    Without a warrant or probable cause, Individual Defendants flew a drone over Plaintiff's property to investigate possible illegal marijuana cultivation.

188.    Defendants Copeland and Haynes knowingly trespassed on Plaintiff's property with the drone for much of the drone's flight path.

189.    The drone took numerous photos of Plaintiff's property to search for illegal marijuana cultivation.

190.     Individual Defendants committed an unlawful entry over Plaintiff's property with the drone.

191.     Individual Defendants' drone surveillance of Plaintiff's property constituted a search under Colo. Const. Art. II, Section 7 without a valid search warrant.

192.     No legally recognizable exception existed for Defendants' warrantless entry and search of Plaintiff's property.

193.     No probable cause existed for Individual Defendants to believe that Plaintiff was illegally cultivating marijuana.

194.     The individual Defendants' conduct violated the constitutional rights belonging to Plaintiff of which reasonable law enforcement officers knew or should have known.

195.     The acts and omissions of the Individual Defendants were engaged in pursuant to the custom, policy, and practice of Defendant Montezuma County, which encourage, condone, tolerate, and ratify their law enforcement officers' unlawful entries into and searches of private residences through the use of UAS.

196.     Individual Defendants' violation of Plaintiff's rights under the Colorado Constitution was the direct and proximate cause of, and moving force behind, Plaintiffs' damages.

**Second Claim for Relief**
C.R.S. § 13-21-131
Colo. Const. Art. II, Section 7
Invalid Search Warrants/Unlawful Search
(Defendant Copeland)

197.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

198.    Plaintiff had a constitutionally protected right to be secure in his person against unreasonable intrusions into and searches of his residence and property.

199.    Defendant Copeland acted under color of state law and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

200.    The Defendant Copeland was a "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

201.    Defendant Copeland's warrant affidavits for search warrants 20-58, 20-59, and 20-60 were constitutionally deficient and invalid.

202.    Defendant Copeland knowingly or recklessly made material misrepresentations in the aforementioned search warrant affidavits.

203.    Defendant Copeland used the illegally obtained information from the unlawful drone search to support a finding of probable cause in the affidavits for search warrants 20-58 and 20-59, which were authorized by the magistrate judge.

204.    Without the information obtained from the unlawful drone search, the warrant was invalid, as the information shared from the confidential informant as described in the affidavits were insufficient to constitute arguable probable cause.

205.    Plaintiff's property was unlawfully searched and items seized on September 2, 2020 based on the invalid warrant (20-59) in violation of Plaintiff's Art. II, Section 7 rights.

206.    Defendant Copeland's violation of Plaintiff's rights under the Colorado Constitution was the direct and proximate cause of, and moving force behind, Plaintiffs' damages.

207.    The acts and omissions of Defendant Copeland were engaged in pursuant to the custom, policy, and practice of Defendant Montezuma County, which encourage, condone, tolerate, and ratify their law enforcement officers' unlawful entries onto and searches of private residences through the use of UAS.

### Third Claim for Relief
### 42 U.S.C. § 1983
### Fourth Amendment Violation
### Invalid Search Warrants/Unlawful Search
### (Defendant Copeland)

208.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

209.    Plaintiff had a constitutionally protected right to be secure in his person against unreasonable intrusions into and searches of his residence and property.

210.    Defendant Copeland acted under color of state law and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

211.    Defendant Copeland's warrant affidavits for search warrants 20-58, 20-59, and 20-60 were constitutionally deficient and invalid.

212.    Defendant Copeland knowingly or recklessly made material misrepresentations in the aforementioned search warrant affidavits.

213.    Defendant Copeland used the illegally obtained information from the unlawful drone search to support a finding of probable cause in the affidavits for search warrants 20-58 and 20-59, which were authorized by the magistrate judge.

214.   Without the information obtained from the unlawful drone search, the warrant was invalid, as the information shared from the confidential informant as described in the affidavits were insufficient to constitute arguable probable cause.

215.   Plaintiff's property was unlawfully searched and items seized on September 2, 2020 based on the invalid warrant (20-59) in violation of Plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures.

216.   Defendant Copeland's violation of Plaintiff's rights under the Fourth Amendment was the direct and proximate cause of, and moving force behind, Plaintiffs' damages.

217.   The acts and omissions of Defendant Copeland were engaged in pursuant to the custom, policy, and practice of Defendant Montezuma County, which encourage, condone, tolerate, and ratify their law enforcement officers' unlawful entries onto and searches of private residences through the use of UAS.

**Fourth Claim for Relief**
42 U.S.C. § 1983
**Fourth Amendment Violation**
**Unconstitutional Customs, Policies, and/or Practices**
**(Against Montezuma County)**

218.   Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

219.   Defendant Montezuma County established policies, procedures, customs and/or practices in violation of the Constitution.

220.   Defendant Montezuma County developed and maintained law enforcement-related policies, procedures, customs, and/or practices exhibiting or resulting in a deliberate

indifference to the Fourth Amendment protected constitutional rights of persons in Montezuma County, which proximately caused the violation of Plaintiff's constitutional rights.

221.    Defendant Montezuma County failed to properly train, supervise, and/or discipline its employees regarding lawful searches and lawful entry over private residences.

222.    Defendant Nowlin was a final policymaker of Montezuma County as Sheriff of MCSO.

223.    Defendant Nowlin reviewed all drone operational plans pursuant to MCSO's written policy regarding the use of UAS and repeatedly approved and ratified unconstitutional, warrantless drone searches.

224.    Despite knowing that Individual Defendants were committing unlawful warrantless searches by trespassing on and taking photos of private properties for the purpose of criminal investigation, Defendant Nowlin personally participated in and routinely authorized and ratified illegal and warrantless drone searches.

225.    Defendant Montezuma County repeatedly conducted warrantless drone searches that violated the Fourth Amendment.

226.    Defendant Montezuma County maintained a custom and practice of deliberately ignoring their own UAS Operations policy.

227.    The acts or omissions of Officer Defendants were the moving force behind, and the proximate cause of, injuries sustained by Plaintiff.

228.    The acts described herein were done by Defendants intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Plaintiff's constitutionally protected rights.

229.     The actions of Officer Defendants as described herein deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitutions of Colorado and the United States and caused him other damages.

230.     In light of the duties and responsibilities of those law enforcement officers that participate in providing safety and security for its citizens, the need for specialized training, supervision, and discipline is so obvious, and the inadequacy of training, supervision, and discipline is so likely to result in the violation of constitutional rights such as those described herein, that Defendant Montezuma County is liable for their failure to train, appropriately supervise, and adequately discipline officers and detectives in their respective departments.

231.     The inadequate training, supervision, and discipline provided by Defendant Montezuma County result from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant Montezuma County. Defendant Montezuma County could have and should have pursued reasonable methods for the training, supervising, and disciplining of such employees, yet failed to do so.

232.     Defendant Montezuma County policies, customs, or practices in conducting unlawful and warrantless drone searches, and failing to train, supervise, and discipline its employees were the proximate cause of, and moving force behind, the violation of Plaintiffs' constitutional rights, which caused Plaintiffs' damages as set forth above.

**Fifth Claim for Relief**
42 U.S.C. § 1983
Fourth Amendment - Malicious Prosecution
(Against All Defendants)

233.   All statements of fact set forth previously are hereby incorporated into this claim as though set forth fully herein.

234.   All Defendants, without arguable probable cause, conducted a warrantless drone search of Plaintiff's property and used the illegally obtained information to charge Plaintiff with a criminal offense in order to maliciously bring about his criminal prosecution.

235.   Defendants, acting knowingly, maliciously, willfully and wantonly, participated in the institution of legal criminal proceedings against Plaintiff, including promoting the continued criminal prosecution of Plaintiff with knowledge that the grounds for obtaining the search warrant and conducting the subsequent search were based on their illegal drone search and that without that information, there would be no probable cause.

236.   Plaintiff's criminal case was dismissed after a year and seven months spent defending the case and after prevailing on a Motion to Suppress.

237.   Defendants were motivated by an improper purpose to punish Plaintiff in an effort to divert attention from their own misconduct and to insulate themselves from civil liability.

238.   Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

239.   Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages.

### Prayer For Relief

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including, but not

limited to:

    a.  Appropriate declaratory and other injunctive and/or equitable relief;

    b.  Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

    c.  All economic losses on all claims allowed by law;

    d.  Exemplary damages;

    e.  Attorney's fees and the costs associated with this action, including those associated with having to defend against the false criminal charge as well as expert witness fees, on all claims allowed by law;

    f.  Pre- and post-judgment interest at the lawful rate; and

    g.  Any further relief this court deems just and proper, and any other relief as allowed by law.

    h.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this May 1, 2023.

TYRONE GLOVER LAW, LLC

*s/ Helen Oh*

_____

Helen Oh #54056
Tyrone Glover #41529
TYRONE GLOVER LAW, LLC
2590 Walnut Street
Denver, CO 80205
tyrone@tyroneglover.com

helen@tyroneglover.com
Phone: 303-577-1655

ATTORNEYS FOR PLAINTIFF